```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
```

|                                |   |                           |
|--------------------------------|---|---------------------------|
| ERIN REAVES,                   | ) |                           |
|                                | ) |                           |
|             Plaintiff,         | ) |                           |
|                                | ) |                           |
|         v.                     | ) | CIVIL ACTION              |
|                                | ) | NO. 3:23-00403-WGY-SJH    |
| IMMEDIATE MEDICAL CARE, P.A.   | ) |                           |
|                                | ) |                           |
|             Defendant.         | ) |                           |

YOUNG, D.J.[1]                                         March 12, 2025

**FINDINGS OF FACT AND RULINGS OF LAW**

The Court enters the following findings of fact and rulings of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**I.   INTRODUCTION**

Erin Reaves ("Reaves") brought this action against Immediate Medical Care, P.A. ("Immediate") for declaratory and injunctive relief pursuant to Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189.  See Am. Compl., ECF No. 63.  Reaves alleges that she arrived at Immediate's clinic in Jacksonville, Florida for an appointment on April 5, 2023, but was unlawfully denied access to Immediate's public accommodation due to the presence of her

---

[1] Of the District of Massachusetts, sitting by designation.

[1]

service dog Malia.  The parties filed cross-motions for summary judgment, ECF Nos. 85 & 91.

On January 30, 2025, this Court held a status conference at which it denied Reaves's motion for summary judgment, and set the date for a prompt bench trial to begin on February 3, 2025.  See Minute Entry, ECF No. 106.  On the first day of trial, the Court denied Immediate's motion for summary judgment.  See Minute Entry, ECF No. 109.  After a three-day bench trial, the Court ruled in favor of Immediate.  See Minute Entries, ECF Nos. 109, 111, and 119.  The Court now provides its written findings of fact and rulings of law.

## II. FINDINGS OF FACT[2]

After reviewing the testimonial, documentary, and video evidence admitted at trial, the Court finds the following facts by a preponderance of the evidence.

Immediate operates a medical facility in Jacksonville, Florida.

Reaves suffers from post-traumatic stress disorder ("PTSD"), anxiety, and bipolar disorder.  The Court credits Reaves's testimony that each of these conditions substantially

---

[2] The Court issued initial findings of fact from the bench immediately upon the conclusion of the final arguments when matters were freshest in the Court's mind.  What follows is completely consistent with the transcript.  If it is not, of course, the transcript governs.

[2]

limit one or more major life activities, including the jobs she is able to perform and, on bad days, her ability to perform basic tasks. Reaves's testimony is further buttressed by the testimony of her fiancée Mariah Hockman ("Hockman"), and by other record evidence. Hockman testified that Hockman has observed Reaves's panic attacks, destructive behaviors, and regular fainting incidents.

Reaves has a service dog, Malia, who is trained to perform tasks to alert Reaves and to mitigate self-harming behavior. Malia was trained by Hockman and Reaves, and attended specialized service training at East Tennessee Canine Academy in Lenoir City, Tennessee.

On April 5, 2023, Reaves and her fiancée Hockman arrived at Immediate's facility where Reaves had an appointment in her search for a new primary care physician. Reaves and Hockman, who have family in the area, resided in the area at the time.

Eve Hochstetler ("Hochstetler"), a patient of Immediate, was in Immediate's waiting area and provided an affidavit that was stipulated as admissible in lieu of testimony. See Minute Entry, ECF No. 111. Hochstetler averred that she witnessed the incident in question, and that, after Reaves arrived, Immediate employee Julia Smith ("Smith") asked Reaves what kind of dog Malia is, and was told that Malia is her "emotional support

dog."[3]  Hochstetler Aff., Ex. 20.  Hochstetler then observed the following:

> Then, Julia said to Erin that **Dr. Gargin has an allergy to dogs**.  Erin's friend stated that allergy is not an exception to the ADA policy.  Julia said that Dr. [Kathleen] Gargin [Bechen] has a very bad allergy to dogs and it could cause her to breath [sic] with difficulty.  **She is able to see you if you leave the dog in the lobby or outside the front door with your friend**.  Again, Erin's friend stated now in a much louder voice that allergy is not one of the exceptions to the ADA policy.  **Julia tried to explain to Erin Reaves again about the allergy and offered to see [Immediate's owner] Dr. Moosavi** but she was argumentative.  Julia went to the back office and came back to her desk and called the police for assistance with the situation.  In addition, . . . Erin Reaves . . . exited from her car and walked perfectly fine to her car's trunk.  She stood unassisted, unsupported, and walked around before sitting in her wheelchair.  The wheelchair did not have any foot or leg support.  She was moving her legs freely on the ground to move her wheelchair forward.  She did not use the wheels and her arms to move the wheelchair as someone who has a disability and is wheelchair bound.  The reason I noticed her actions are due to my advanced training with Veterans and their ADA needs at my tenure at Wounded Warrior Project, Inc.  Upon entering the office Erin Reaves blocked the front desk and she instructed to her friend to pull her phone out to start recording and stated **"We are going to get them."**

Id. (emphasis added).  The Court credits Hochstetler's testimony.

Malia was at all times on a leash, in a harness identifying Malia as a service animal, and at all times relevant here, was well-behaved.  Malia was neither disruptive nor aggressive.

---

[3] The Court is aware that an emotional support animal is not necessarily a service animal under the ADA.

Dr. Gargin testified that she is severely allergic to dogs. As for the incident, Dr. Gargin was not an eyewitness to most of this encounter, having spotted the dog as she passed by the front desk and immediately told Smith, "the dog has to go," before returning to her office. Dr. Gargin did, however, confirm that she soon discussed with Smith in her office possible modifications with Smith, such as an alternative appointment with another doctor or going ahead with the appointment herself while Malia waited outside. The Court credits that Smith relayed Dr. Gargin's options to Reaves and Hockman, but at that point their backs were up, and they insisted that Reaves's ADA rights had been violated.

This is approximately where Reaves's video recording of the incident picks up: Reaves asks an employee (apparently Smith, as she was identified at trial) to "confirm that [Reaves is] being denied [her] appointment because of [her] task trained medical alert service dog," Smith tells her that Immediate "cannot see [her] today" because it "cannot have animals inside [its] office" due to "patients with allergies," and then informs Reaves that Immediate will have to cancel her appointment and that she must leave immediately with her dog, while Reaves and (as was clarified at trial) Hockman describe their rights under the ADA and its lack of an allergies exception. Ex. 2.

Immediate called the Sheriff's Office and, shortly after the Sheriff's Deputy arrived, Reaves and Hockman left the facility with Malia.  Portions of the Sheriff's Deputy's body camera video were admitted into evidence, including discussions between the Sheriff's Deputy, Reaves, and Hockman just after Reaves and Hockman left Immediate.  Ex. 1.

**III. RULINGS OF LAW**

To prevail on her ADA claim, Reaves must prove: (1) that she is disabled; (2) that the defendant owns, leases, or operates a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA.  Norkunas v. Seahorse NB, LLC, 444 Fed. App'x 412, 416 (11th Cir. 2011) (citing 42 U.S.C. § 12182(a)).  "[T]he plaintiff has the burden of proving discrimination in an ADA claim."  Id.  The parties do not dispute that Immediate is a place of public accommodation.  See Pl.'s Mot. Summ. J. & Mem. Law Supp. 2-3, ECF No. 91.

The Court rules on the above facts that Reaves was disabled within the meaning of the ADA, but that Immediate did not unlawfully discriminate against Reaves because Malia posed a threat to the health and safety of the doctor Reaves was scheduled to see, and Immediate attempted to offer safe alternatives to the scheduled appointment.  That attempt shows the required "individualized assessment" of a direct threat to

[6]

safety, including a determination of whether "reasonable modifications" would mitigate the threat, that stands as an exception to the general rule that service dogs must be allowed in places of public accommodation. 28 C.F.R. § 36.208(b).

Accordingly, judgment shall enter in favor of Immediate.

### A. Reaves Proved She Is Disabled

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). The ADA's implementing regulations define "major life activities" broadly to encompass "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, . . . breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working," and the like. 28 C.F.R. § 36.105(c)(1)(i). "[T]he threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." Id. § 36.105(d)(1)(ii).

At least some of the disabilities Reaves identified, including PTSD and bipolar disorder, qualify as protected disabilities for purposes of the ADA provided that they substantially limit one's life activities, and Reaves has presented some evidence that she was diagnosed with PTSD as early as 2013. Ex. 5, at 33; see 28 C.F.R. § 36.105(d)(2)(iii)(K) (listing bipolar disorder and PTSD as among

[7]

those impairments that should "easily be concluded" will "substantially limit . . . major life activities"); C.L. v. Del Amo Hospital, Inc., 992 F.3d 901 (9th Cir. 2021) (treating PTSD as a protected disability under Title III of the ADA). As the Court has found that Reaves suffers from medical conditions that interfere with one or more major functions, the Court rules that she is a disabled person within the meaning of the ADA.

B. **Reaves's Service Dog Malia**

Malia is a "service dog" under the ADA. The ADA does not set a demanding standard for evaluating the qualifications and training of service dogs:

> The ADA's implementing regulations define a service animal as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability," including a psychiatric disability, where the work or tasks are "directly related to the individual's disability." The regulations do not specify by whom the dog must be trained.

Del Amo Hosp., Inc., 992 F.3d at 910-11 (quoting 28 C.F.R. § 36.104). More specifically, "DOJ regulations and commentary make clear that individuals may self-train service animals without obtaining formal certification." Id. at 911. Consistent with these regulations, the Ninth Circuit has rejected a strict formal certification requirement, on the grounds that the ADA defines a service dog by its function, not its training, and that such a requirement would frustrate the

[8]

purposes of the ADA and its implementing regulations. Id. at 910. Indeed, in only the most egregious circumstances have courts ruled that a service animal fails based upon its training. See, e.g., Salari v. Walt Disney Parks & Resorts U.S., Inc., No. 8:23-cv-01406, 2024 WL 4867567, at *3 (C.D. Cal. Sept. 6, 2024) (finding that dog was not a service animal where it had received no formal service animal training and performed no identified tasks beyond comforting presence); Rose v. Springfield-Greene Cnty. Health Dept., 668 F. Supp. 2d 1206, 1214-15 (W.D. Mo. 2009) (finding evidence of training insufficient where there was no link between monkey's comforting presence and aggressive behaviors toward others and any training or cues).

Reaves and Hockman testified that they both trained Malia. Reaves testified that Malia performs specific tasks that assist with her disability, such as pressing on her body, licking, and clawing her to "ground" her when she is struggling with anxiety, and noticing and responding to symptoms such as picking at her skin. Hockman testified that Malia is very attentive to Reaves and does as she is trained. Immediate misconstrues the one piece of evidence that suggests Malia received professional service training: the certificate from East Tennessee Canine Academy states that "we can consider the service training of the dog Malia to be completed and . . . they are ready to assist her

[9]

owner Erin Reaves to live their life to the fullest," indicating that the Academy considered Malia's service training to be "completed," not, as Immediate contends, that it was still to be completed in the future. Def.'s Ex. 7, ECF No. 93-5.

While the eyewitness affidavit, discussed above, represents that Reaves initially identified Malia as an "emotional support dog" that "helps with [her] anxiety" when she arrived at Immediate for her appointment, see Hochstetler Aff., the preponderance of the evidence supports a ruling that Malia qualifies as a "service animal." This Court credits Reaves's and Hockman's consistent representations as to Malia's training, supported by record evidence. Immediate's attempt to undercut this evidence at trial by pointing out that Reaves represented Hockman to be Malia's "primary trainer" in response to an interrogatory, and that Hockman admits to not being a professional trainer, is not relevant, since even a self-trained dog may qualify as a service animal if, as here, she performs specific, trained tasks. See Frequently Asked Questions about Service Animals and the ADA ("DOJ FAQ"), ADA.gov (Feb. 28, 2020), Question 5, https://www.ada.gov/resources/service-animals-faqs/ ("People with disabilities have the right to train the dog themselves and are not required to use a professional service dog training program."). This Court also directly observed Malia at trial and in video evidence responding to

[10]

Reaves's mental state. The weight of the evidence paints a consistent picture of Malia as trained, by Reaves and others, to perform specific tasks that assist her in dealing with her disabilities. Thus, this Court rules that Malia is a "service animal" for purposes of the ADA.

### C.    Immediate Did Not Discriminate Against Reaves

As a general rule, "[p]ublic accommodations . . . must permit disabled individuals to use service animals unless they can show a regulatory exception applies." Matheis v. CSL Plasma, Inc., 936 F.3d 171, 174 (3d Cir. 2019). Allowing service animals in a place of public accommodation is a presumptively reasonable modification to that accommodation's policies: "Generally a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1). Given that the Court has ruled that Reaves was disabled and that Malia is a service animal, then, the case hinges on whether some exception to this general rule applies to Reaves's visit.

As a general proposition, allergies are not enough to except a place of public accommodation from accommodating a service animal. See ADA Requirements: Service Animals, ADA.gov (Feb. 28, 2020), https://www.ada.gov/resources/service-animals-2010-requirements/ ("Allergies and fear of dogs are not valid

[11]

reasons for denying access or refusing service to people using service animals. When a person who is allergic to dog dander and a person who uses a service animal must spend time in the same room or facility, for example, in a school classroom or at a homeless shelter, they both should be accommodated by assigning them, if possible, to different locations within the room or different rooms in the facility."). Despite this rule, a service animal may nonetheless be excluded if it poses a direct threat to the health and safety of persons providing or receiving services from an accommodation. 28 C.F.R. § 36.208; see, e.g., Lockett v. Catalina Channel Express, Inc., 496 F.3d 1061, 1066 (9th Cir. 2007) (applying direct threat exception to potential threat to train passengers' allergies posed by service dog).

Whether a service animal poses a "direct threat" for purposes of the ADA must be determined by:

> **an individualized assessment,** based on reasonable judgment **that relies on current medical knowledge or on the best available objective evidence,** to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; **and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.**

28 C.F.R. § 36.208(b) (emphasis added); see also Bennett, 86 F. 4th at 327-28. "Service animals need not be accommodated under every circumstance, and the regulations specify the situations

[12]

in which a public entity may reasonably exclude a service animal" -- safety among them, such that "if an individual's use of a service animal poses a direct threat, it may be excluded under this provision."  Bennett, 86 F. 4th at 327.  "'The existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who [makes the decision], and the risk assessment must be based on medical or other objective evidence.'  The belief that a significant risk existed . . . does not relieve a defendant of liability." R.W. v. Board of Regents of the Univ. Sys. of Ga., 114 F. Supp. 3d 1260, 1283-84 (N.D. Ga. 2015) (quoting Bragdon v. Abbott, 524 U.S. 624, 649 (1998)).  Specifically, courts "should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments." Id. (quoting Bragdon, 524 U.S. at 650).

It is not entirely clear what special burden, if any, ought be placed on Immediate to show that it has conducted an individualized assessment of an alleged safety risk, given that the burden to show discrimination rests, in general, on Reaves. See Matheis, 936 F.3d at 179 (rejecting the burden-shifting framework used in other discrimination contexts in favor of a requirement that the defendant "**establish**[] exceptions that permit . . . [it] . . . to deny a disabled individual's use of a service animal" (emphasis added) (citing Berardelli v. Allied

[13]

Servs. Inst. of Rehab. Med., 900 F.3d 104 (3d Cir. 2018))); Johnson v. Gambrinus Co./Spoetzl Brewery, 116 F.3d 1052, 1058-60 (5th Cir. 1997) (placing the burden of proof to show that a proposed reasonable modification would fundamentally alter the nature of the public accommodation or jeopardize its safety on the defendant, and characterizing these exceptions as "affirmative defense[s]," without addressing the regulations at issue here)).[4] The Eleventh Circuit has placed the burden on the defendant to show that the analogous exception for modifications that would "fundamentally alter the nature of" a public accommodation's services and facilities applies, A.L. by and through D.L. v. Walt Disney Parks and Resorts US, Inc., 900 F.3d 1270, 1292-93 (11th Cir. 2018), and the parties here agree that the burden shifts to Immediate on this issue.  Accordingly, this

---

[4] One federal district court has recently stated that "[d]irect threat is an affirmative defense," Bennett v. Hurley Med. Ctr., 2023 WL 319925, at *11 (E.D. Mich. Jan. 19, 2023) (citing Tamara v. El Camino Hosp., 964 F. Supp. 2d 1077, 1085 (N.D. Cal. 2013)), and in the Ninth Circuit this defense comes with a "heavy burden" on the defendant to show that it applies, Tamara, 964 F. Supp. 2d at 1085 (quoting Lockett v. Catalina Channel Express, Inc., 496 F.3d 1061, 1066 (9th Cir. 2007)). Another federal district court has recently described it as "the **defendants' burden** to demonstrate" that a reasonable modification would pose a direct threat to health and safety. Doe v. Rhode Island Interscholastic League, 735 F. Supp. 3d 99, 114 (D.R.I. 2024) (emphasis added); see also Doe v. Deer Mountain Day Camp, Inc., 682 F. Supp. 2d 324, 347 (S.D.N.Y. 2010) (similar).

[14]

Court presumes that it does, while noting that the Eleventh Circuit has not squarely ruled on this issue.[5]

Based upon the facts found above by a preponderance of the evidence, the Court rules that the direct threat exception applies, and thus Immediate has not discriminated against Reaves for purposes of the ADA as matter of law.  Even the Ninth Circuit, which has decisively held that the burden to show direct threat shifts to the plaintiff and that it is a "heavy burden," Tamara, 964 F. Supp. 2d at 1085 (quoting Lockett, 496

---

[5] In the Eleventh Circuit, in the context of deciding whether an employee's disability poses a "direct threat" to its employer (a question governed by Title I, not Title III, of the ADA), "[t]he employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996). The circuits are not uniform in this interpretation.  See Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1292-94 (10th Cir. 2000) (collecting cases across circuits on this issue, some of which place the burden on the employer).  There are good reasons to distinguish Title I of the ADA from Title III on some issues, see Dudley v. Hannaford Bros. Co., 333 F.3d 299, 308-09 (1st Cir. 2003) (noting Title I's assumption that employers have basic familiarity with their employees, as opposed to Title III's dealing with the citizenry at large), but the "fundamentally alter" and "direct threat" exceptions stem from distinct parts of the relevant statutes and regulations, so it is not clear that they should always be interpreted in the same way, see 42 U.S.C. §§ 12182(b)(2)(A)(ii), 12182(b)(2)(A)(iii), 12182(b)(3); 28 C.F.R. §§ 36.208, 36.301(b), 36.302(a).  Thus, Eleventh Circuit case law on the issue of whether the burden shifts to the defendant to show that the plaintiff posed a "direct threat," including a showing that the defendant considered reasonable modifications to mitigate the threat, is inconclusive.  Nevertheless, the weight of persuasive authority suggests that the burden ought shift to Immediate, and this Court presumes that it does.

[15]

F.3d at 1066), has allowed for the "one-time" exclusion of a service dog from certain areas, informed by a prior policy of exclusion of such dogs from an allergy-free zone, which forced employees to "decide on the spot whether to potentially expose [allergic customers] to dander or to ask [the plaintiff to move to a different area]," Lockett, 496 F.3d at 1065-66.  Since this Court credits that Smith did, indeed, offer Reaves an alternative appointment with Dr. Moosavi, or an appointment with Dr. Gargin herself so long as Malia was taken outside, Immediate has shown that it conducted an "individualized assessment" of the risks posed by Malia based on "the best available objective evidence," and considered "reasonable modifications" to mitigate those risks.  28 C.F.R. § 36.208(b); see also Bennett, 86 F. 4th at 329-31 (affirming district court's determination that defendant reasonably concluded service animal was a direct threat to medical center based on an individualized assessment factoring in previous allergic reactions, particularly threatened allergic individual, and lack of knowledge regarding other potentially allergic patients).

    This ruling is supported by the evidence presented at trial and by the comparative credibility of the witnesses.  Immediate produced evidence suggesting that it weighed the best available objective evidence -- Dr. Gargin's testimony regarding her severe allergy to dogs, based on her prior consultation with her

[16]

doctor and her own knowledge of her allergy and its symptoms -- in determining that Dr. Gargin could not conduct the scheduled visit with Reaves with Reaves's service animal present, and evidence that it weighed reasonable modifications in deciding that this was the case -- particularly Hochstetler's affidavit, relaying her eyewitness testimony of what occurred during Reaves's visit.[6]

Conversely, Reaves's failure to produce medical records pertaining to serious medical conditions and incidents to which she testified, while not determinative on the issue of whether she has a protected disability, raises concerns that she may exaggerate and may not have been fully forthcoming in her representations to this Court. Additionally, Reaves's seemingly conflicting representations in the record as to whether she does or does not smoke further raises concerns with her credibility on other issues. See Ex. 5, at 19, 29. Hochstetler, on the other hand, is an apparently disinterested eyewitness, and her testimony by affidavit is consistent with the testimony of Dr. Gargin about her allergy and her instructions to Smith at trial, which this Court finds credible.

---

[6] In addition to Hochstetler's affidavit, the sheriff's bodycam video of the incident shows that Immediate at least discussed Dr. Gargin's allergy with Reaves at some point -- a fact which Reaves minimized at trial -- which fits better with Immediate's version of the events. Ex. 1.

[17]

Given that this appears to have been a one-time decision, based on Dr. Gargin's warning and informed by a previous incident involving her severe allergy, as Dr. Gargin testified at trial, even the apparently somewhat expedient decision to exclude Malia clears the bar for establishing the direct threat exception.  The regulation requires only a "reasonable judgment," not a perfect one.  28 C.F.R. § 36.208(b).  Therefore, this Court rules that Immediate has carried its burden and shown that it conducted an individualized assessment of the direct threat posed by Malia and reasonably concluded that, without the reasonable modifications it proposed to Reaves, this threat to Dr. Gargin's health and safety required Malia's exclusion from Reaves's appointment with Dr. Gargin.  There was, therefore, no ADA violation as matter of law when Immediate canceled Reaves's appointment and required Reaves to leave with Malia upon Reaves's rejection of the alternatives that Immediate offered.

## IV.   CONCLUSION

Accordingly, this Court rules in favor of Immediate and finds that there was no ADA violation as matter of law based upon a preponderance of the evidence adduced at trial.

**SO ORDERED.**

                                        /s/ William G. Young
                                      WILLIAM G. YOUNG
                                          JUDGE
                                          of the
                                      UNITED STATES[7]

---

[7] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.

[19]